IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RYAN KLEBBA, *on behalf of himself and others similarly situated*, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | 1:18-CV-438-RP |
| NETGEAR, INC., | § § § | |
| Defendant. | § § | |

## ORDER

Before the Court is Defendant Netgear, Inc.'s ("Netgear") Motion to Compel Arbitration and to Dismiss Plaintiff's Claims, (Dkt. 21), along with the parties' responsive filings, (Dkts. 25, 30). Also before the Court is Netgear's motion for a hearing regarding its motion to compel. (Dkt. 32). Having considered the parties' briefs, the evidence, and the relevant law, the Court finds that the motion to compel should be granted in part without a hearing.

## I. BACKGROUND

In August 2017, Plaintiff Ryan Klebba ("Klebba") bought a baby monitor from Netgear called the Arlo Baby. (Compl., Dkt. 1, at 1–3). Klebba lives in Austin, Texas; Netgear is headquartered in Cailfornia and incorporated in Delaware. (*Id.* at 3). Klebba bought the Arlo Baby online. (*Id.* at 11). The Arlo Baby allegedly did not work as advertised: the video and audio stream was unreliable, and the camera frequently disconnected from the display. (*Id.* at 4–13). Netgear also never produced a companion tablet that would connect to the monitor without an active internet connection. (*Id.* at 15–18). Accordingly, Klebba has now sued Netgear for violations of Texas, California, and federal laws governing express and implied warranties; violations of California false

1

advertising and unfair competition statutes; and unjust enrichment. (*Id.* at 21–38). He seeks to represent a class of similar dissatisfied consumers. (*Id.* at 18–21).

Anyone who buys an Arlo Baby has to create an Arlo account on Netgear's website or through a smartphone app. (Mot. Compel, Dkt. 21, at 2). Klebba created an Arlo account online. (Resp. Mot. Compel, Dkt. 25, at 3). To create an Arlo account online, a customer must visit a sign-in webpage in which he or she must populate a set of fields: first and last name, email address, and password. (Mot. Compel, Dkt. 21, at 3–4). At the bottom of that page, beneath the fields, is an empty checkbox next to the words "I agree to the Terms of Service." (*Id.* at 4). The words "Terms of Service" are hyperlinked to a different webpage containing Netgear's terms of service for the Arlo Baby. (*Id.* at 5–6). Beneath that checkbox is a button labeled "Next," which appears grey and does not operate until the customer clicks on the checkbox. (*Id.* at 4). If a customer clicks on the "Terms of Service" hyperlink, Netgear's webpage containing its terms of service ("Terms") opens in a new browser window. (*Id.* at 5). At the bottom of the terms-of-service page is a green button labeled "Agree" and a black button labeled "Disagree." (*Id.* at 6). If a customer clicks "Agree," he or she returns to the sign-in page, where the checkbox is automatically checked. (*Id.*). Once the customer checks the checkbox, either by reading the Terms and selecting "Agree" or simply checking the box without reading the Terms, the "Next" button turns blue and becomes operative, and the customer can proceed with creating his or her Arlo account. (*Id.* at 4, 6). A customer cannot create an Arlo Account without agreeing to the Terms by checking the checkbox. (*Id.* at 6).

The Terms advise customers that they agree to the Terms by using the Arlo Baby. (*Id.* at 7). The Terms contain arbitration, choice-of-law, and venue provisions, along with a class action waiver. (*Id.* at 8). Netgear now seeks to enforce that arbitration provision. (*Id.* at 9–16). Klebba objects that

he never agreed to arbitrate this dispute, and that even if he did, his agreement is unenforceable. (Resp. Mot. Compel, Dkt. 25, at 4–16).[1]

## II. DISCUSSION

The Federal Arbitration Act permits a party to file a motion to compel arbitration based on "the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration." 9 U.S.C. § 4. "Enforcement of an arbitration agreement involves two analytical steps. The first is contract formation—whether the parties entered into any arbitration agreement at all. The second involves contract interpretation to determine whether this claim is covered by the arbitration agreement." *Kubala v. Supreme Prod. Services, Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). That analysis changes "where the arbitration agreement contains a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim." *Id.*

When there is a purported delegation clause, a court "performs the first step—an analysis of contract formation—as it always does. But the only question, after finding that there is in fact a valid agreement, is whether the purported delegation clause is in fact a delegation clause—that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated." *Id.* at 202. "If there is a delegation clause, the motion to compel arbitration should be granted in almost all cases." *Id.* Netgear's arbitration agreement contains a delegation clause because it incorporates the JAMS Streamlined Arbitration Rules & Procedures, which provide that:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

---

[1] Klebba also argues that, even if he did agree to arbitration and if the agreement is enforceable, his false advertising claims fall outside the scope of the agreement. (Resp. Mot. Compel, Dkt. 25, at 19–20).

(Mot. Compel, Dkt. 21, at 8, 13). The express adoption of these rules, if in fact the parties formed a contract, "presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012); *Cooper v. WestEnd Capital Mgmt., L.L.C.*, 832 F.3d 534, 546 (5th Cir. 2016) (finding unmistakable evidence of intent to arbitrate arbitrability where the parties' agreement adopted the JAMS Rules).

Klebba's contention that Netgear's Terms are unconscionable under California law and that his false advertising claims are not covered by the arbitration clause are questions of validity and scope, respectively. *Edwards v. Doordash, Inc.*, 888 F.3d 738, 746 (5th Cir. 2018) (finding that unconscionability is not a contract formation issue under California law, but rather a validity issue to be decided by an arbitrator pursuant to a delegation clause).[2] If the parties did indeed form an arbitration agreement, then they have delegated these questions to an arbitrator to decide. *Id.* However, Klebba's argument that he never entered into an arbitration agreement with Netgear, (Resp. Mot. Compel, Dkt. 25, at 4), must be considered by this Court. *Id.* at 744 ("Arguments that an agreement to arbitrate was never formed, though, are to be heard by the court even where a delegation clause exists.") (citing *Kubala*, 830 F.3d at 202); *see also Arnold v. Homeaway, Inc.*, 890 F.3d 546, 550 (5th Cir. 2018) (noting that arguments about whether the alleged obligor ever signed the contract fall in the category of whether an agreement existed). Netgear, the party seeking to compel arbitration, need only prove the existence of an arbitration agreement by a preponderance of the evidence. *Grant v. Houser*, 469 F. App'x 310, 315 (5th Cir. 2012).

Netgear argues that California law applies to the parties' contract-formation dispute because the Terms state that the agreement is governed by California law. (Mot. Compel, Dkt. 21, at 10). Klebba acknowledges that state law governs contract formation but takes no position on which

---

[2] Moreover, because Klebba's unconscionability argument applies to the arbitration agreement as a whole, as opposed to the delegation clause alone, the Court must treat the delegation clause as valid and leave Klebba's agreement-wide validity challenge to an arbitrator. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010).

4

state's law applies here. (Resp. Mot. Compel, Dkt. 25, at 3–4).³ Nonetheless, because Klebba denies agreeing to the Terms, the Terms' choice-of-law provision does not determine the decisional law for the parties' contract-formation dispute. (Resp. Mot. Compel, Dkt. 25, 6). The Court must therefore look outside the Terms to choose the applicable state law with which to analyze that dispute.

Klebba invokes this Court's diversity jurisdiction as modified by the Class Action Fairness Act, 28 U.S.C. § 1332(d). (Compl., Dkt. 1, at 3); *see also Audler v. CBC Innovis Inc.*, 519 F.3d 239, 248 (5th Cir. 2008) ("CAFA is based on diversity jurisdiction."). Federal courts sitting in diversity apply the choice-of-law rules of the forum state. *Williams v. Liberty Mut. Ins. Co.*, 741 F.3d 617, 620 (5th Cir. 2014) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). The Court therefore must apply Texas's choice-of-law rules, which provide that a contract dispute is governed by the law of the state with the "most significant relationship to the transaction and the parties." *Maxus Expl. Co. v. Moran Bros., Inc.*, 817 S.W.2d 50, 53 (Tex. 1991). The following factors are relevant to the most-significant-relationship analysis in the context of contract disputes: "(1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Reddy Ice Corp. v. Travelers Lloyds Ins. Co.*, 145 S.W.3d 337, 344 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (citing *Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735–36 (Tex. 1997)); *see also Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 170 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

---

³ Whether the parties "entered a valid arbitration contract turns on state contract law." *Kubala*, 830 F.3d at 202; *see also Covington v. Aban Offshore Ltd.*, 650 F.3d 556, 559 n.2 (5th Cir. 2011) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.") (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

The Court finds that Texas law applies to the parties' contract-formation dispute because Texas has a more significant relationship to the transaction and the parties than California.[4] Klebba lives in Texas, bought the Arlo Baby from his home in Texas, and Netgear delivered it to Texas. (Compl., Dkt. 1, at 11). Klebba registered for an Arlo account in Texas, was presented with the Terms in Texas, and agreed to the Terms—if at all—sitting at a computer in Texas. (Resp. Mot. Compel, Dkt. 25, at 2). Although Netgear is headquartered in California, there is no evidence that the other factors favor California.

The Court therefore looks to Texas law to determine whether Klebba agreed to the Terms when he checked the checkbox next to the words "I agree to the Terms of Service." (Resp. Mot. Compel, Dkt. 25, at 2).[5] To ascertain Texas law, the Court looks first to final decisions of the Texas Supreme Court or, in the absence of such decisions, to decisions of Texas's intermediate appellate courts for guidance. *See Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000). Other sources of guidance for making an *Erie* guess include: "(1) decisions of the Texas Supreme Court in analogous cases, (2) the rationales and analyses underlying Texas Supreme Court decisions on related issues, (3) dicta by the Texas Supreme Court, (4) lower state court decisions, (5) the general rule on the question, (6) the rulings of other courts of other states to which Texas courts look when formulating substantive law and (7) other available sources, such as treatises and legal commentaries." *Shakeri v. ADT Sec. Servs., Inc.*, 816 F.3d 283, 291 (5th Cir. 2016) (cleaned up) (quoting *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel L.L.C.*, 620 F.3d 558, 564 (5th Cir. 2010)).

---

[4] Netgear believes that the question of whether Texas or California law applies "is not outcome determinative" because the states' contract law in not "meaningfully distinct" in the relevant ways. (Mot. Compel, Dkt. 21, at 10).
[5] Although Klebba insists that he "has no specific recollection of agreeing to any terms of use," (Resp. Mot. Compel, Dkt. 25, at 2), he "does recall creating an online account with Arlo," (*id.*), and "does not dispute the authenticity of [Netgear's] delcarations," (*id.* at 4), one of which states that (a) a customer cannot set up an Arlo account without checking the I-agree-to-the-Terms checkbox and (b) someone named "Ryan Klebba" set up an Arlo account. (Escudero Decl., Dkt. 21-1, at 6–7). Netgear has shown by a preponderance of the evidence that Klebba checked the checkbox.

When making an *Erie* guess, the Court's task "is to attempt to predict state law, not to create or modify it." *Keen v. Miller Envt'l Grp., Inc.*, 702 F.3d 239, 243 (5th Cir. 2012).

Unfortunately for Klebba, Texas law does not favor his position that he did not agree to the Terms, which the parties agree is a "clickwrap" agreement,[6] when he checked the checkbox. "A party who signs a document is presumed to know its contents." *In re Intern. Profit Assoc., Inc.*, 286 S.W.3d 921, 923 (Tex. 2009) (cleaned up). Accordingly, "parties to a contract have an obligation to protect themselves by reading what they sign and, absent a showing of fraud, cannot excuse themselves from the consequences of failing to meet that obligation." *Id.* at 924. These same rules "appl[y] to contracts which appear in an electronic format." *Barnett v. Network Sols., Inc.*, 38 S.W.3d 200, 204 (Tex. App.—Eastland 2001, pet. denied). "A signature, electronic or otherwise, is generally deemed to be sufficient to show assent to an arbitration agreement." *Alorica v. Tovar*, -- S.W.3d --, 08-18-00008-CV, 2018 WL 6167963, at *3 (Tex. App.—El Paso Nov. 26, 2018, no pet. h.).

In light of these principles, "Texas courts recognize the validity of clickwrap agreements." *Fieldtech Avionics & Instruments, Inc. v. Component Control.Com, Inc.*, 262 S.W.3d 813, 818 n.1 (Tex. App.—Fort Worth 2008, no pet.) (citing, *inter alia*, *Barnett*, 38 S.W.3d at 203–04). In *Barnett*, for example, the plaintiff claimed that he was not aware of a forum selection clause in an online registration agreement because it was "hidden in the . . . agreement." *Id.* at 203–04. Barnett's agreement required more of him than Netgear required of Klebba: Barnett had to scroll through the agreement before he could accept its terms. *Id.* at 204.[7] Because Barnett "had an adequate opportunity to read and understand the forum selection clause," it was his responsibility to read the electronic contract, and he "[could not] complain" for not doing so. *Id.* And although Barnett's

---

[6] (Mot. Compel, Dkt. 21, at 10; Resp. Mot. Compel, Dkt. 25, at 8).

[7] The agreement in *Barnett* is commonly referred to as a "scrollwrap" agreement. *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 386 (E.D.N.Y. 2015).

7

agreement required more of him than a standard clickwrap agreement, district courts in this circuit routinely cite *Barnett* for the proposition that a consumer cannot agree to clickwrap agreement and then later claim that he or she did not agree to some or all of the agreement because he or she did not read it. *See Jia v. Nerium Int'l LLC*, 3:17-CV-03057-S, 2018 WL 4491163, at *3 (N.D. Tex. Sept. 18, 2018) ("It is well established under Texas law that assent through an affirmative 'click' is sufficient to bind the parties."); *Bongalis-Royer v. RJ Worldwide, LLC*, 4:14-CV-330, 2015 WL12778846, at *5 (E.D. Tex. July 16, 2015) ("Texas courts have recognized the validity of electronic contracts . . . [and] have repeatedly upheld the validity of 'clickwrap' agreements."); *In re Online Travel Co.*, 953 F. Supp. 2d 713, 719 (N.D. Tex. 2013); *Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F. Supp. 2d 756, 783 (N.D. Tex. 2006); *RealPage, Inc. v. EPS, Inc.*, 560 F. Supp. 2d 539, 545 (E.D. Tex. 2007).[8] Central to several of these decisions is the fact that, as here, the consumer or end-user could not complete the transaction, download the software, or install the software update without manifesting assent to the terms of use by clicking a checkbox. *Bongalis-Royer*, 2015 WL 12778846, at *5; *In re Online Travel Co.*, 953 F. Supp. 2d at 719; *Recursion Software*, 425 F. Supp. 2d at 783; *RealPage*, 560 F. Supp. 2d at 545.

Because determining whether Klebba formed a contract is a question of state law, the Court's task is to predict Texas law, not create it. *Keen*, 702 F.3d at 243. Texas courts recognize the validity of clickwrap agreements. *Fieldtech Avionics*, 262 S.W.3d at 818 n.1.[9] Because Klebba created an Arlo account, he must have either checked the checkbox or clicked the "Agree" button at the

---

[8] Additionally, dicta in a Texas appellate court decision suggests that a consumer assents to a clickwrap agreement's terms by clicking a box next to a phrase such as "I agree to the terms and conditions." *See Hotels.com, L.P. v. Canales*, 195 S.W.3d 147, 156 (Tex. App.—San Antonio 2006, no pet.) ("By clicking 'I Agree to the Terms and Conditions,' the consumer presumably selected to follow through with the contract, consciously aware of the additional terms and conditions and their availability.").

[9] Klebba argues that checking the checkbox does not automatically form an agreement, and that several factors identified by federal district courts in New York favor a finding that Klebba did not assent to the Terms. (Resp. Mot. Compel, Dkt. 25, at 5–9 (citing *Berkson*, 97 F. Supp. 3d at 402; *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 468–69 (S.D.N.Y. 2017)). Whatever the merits of those courts' approaches to clickwrap agreements, their decisions are not predictive of Texas law.

bottom of the Terms. (*See* Escudero Decl., Dkt. 21-1). Although Klebba insists that he did not know about the arbitration clause, (Klebba Decl., Dkt. 25-1, ¶ 12), "parties to a contract have an obligation to protect themselves by reading what they sign and, absent a showing of fraud, cannot excuse themselves from the consequences of failing to meet that obligation." *In re Intern. Profit Assoc.*, 286 S.W.3d at 924. Klebba concedes that fraud is not at issue here. (Resp. Mot. Compel, Dkt. 25, at 10). He may therefore not excuse himself from his obligation to have read the Terms. The Court finds that Klebba formed an agreement to arbitrate when he checked the checkbox next to the words "I agree to the Terms of Service." Klebba therefore agreed to delegate the determination of his remaining disputes regarding the arbitration clause's validity and scope to an arbitrator. *Edwards.*, 888 F.3d at 746.

Netgear asks the Court to dismiss this action rather than stay it for the duration of arbitration. (Mot. Compel, Dkt. 21, at 14–15). The Federal Arbitration Act provides that a federal court should stay a civil action upon finding that an issue is referable to arbitration. 9 U.S.C. § 3. When all of the issues in an action must be submitted to arbitration, a court may (not must) dismiss the action. *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992); *see also Apache Bohai Corp. v. Texaco China*, 330 F.3d 307, 311 & n.9 (5th Cir. 2003) (finding that the decision of the district court to stay the case pending arbitration was not an abuse of discretion). The arbitration agreement's scope remains in dispute, and an arbitrator may conclude that Klebba's false advertising claim is not subject to arbitration. The Court therefore finds that a stay, rather than dismissal, is appropriate.[10]

---

[10] If any of Klebba's claims are not subject to arbitration and the Court lifts the stay, Netgear may file a motion to transfer venue asserting the arguments raised in its motion to compel. (*See* Mot. Compel, Dkt. 21, at 14–15).

## III. CONCLUSION

For the reasons given above, **IT IS ORDERED** that Netgear's Motion to Compel Arbitration and to Dismiss Plaintiff's Claims, (Dkt. 21), is **GRANTED IN PART**. Netgear's motion is **GRANTED** insofar as Klebba's claims are **STAYED** pending arbitration; all other relief requested in Netgear's motion, including dismissal and transfer, is **DENIED**. Netgear's motion for a hearing, (Dkt. 32), is also **DENIED**. The parties shall file a joint status reports detailing the status of the arbitration proceedings on **June 5, 2019**, and every **120 days** thereafter.

**SIGNED** on February 5, 2019.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE